# In the United States Court of Federal Claims

No. 11-482C

(Filed: September 16, 2014)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * | * | |
| TPL, INC., | * | Jurisdiction; Contract Disputes Act; |
| | * | 41 U.S.C. §§ 7101–7109; Summary |
| Plaintiff, | * | Judgment; RCFC 56; Breach of |
| | * | Contract; Impossibility; |
| v. | * | Impracticability; Mutual Mistake; |
| | * | Unconscionability; Mitigation of |
| THE UNITED STATES OF AMERICA, | * | Damages; Failure to Raise Defense |
| | * | with Contracting Officer. |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * | | |

*Robert Stewart Gardner*, Law Office of Robert S. Gardner, Colorado Springs, CO, for plaintiff.

*Daniel B. Volk*, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him were *Donald E. Kinner*, Assistant Director, *Bryant G. Snee*, Acting Director, and *Stuart F. Delery*, Assistant Attorney General.

## OPINION AND ORDER

This case is before the Court on the government's motion for summary judgment. Plaintiff, TPL, Incorporated (hereinafter "TPL"), seeks relief from the decision of a U.S. Army contracting officer finding that it owes the United States $11,958,046 as compensation for TPL's breach of contractual obligations to demilitarize and dispose of certain Army ammunitions.  The government, in turn, has filed a counterclaim seeking damages in the amount of $11,887,509.72 for TPL's alleged breach of contract.  For the reasons set forth below, the government's motion for summary judgment is **GRANTED**.

## BACKGROUND

### I.    The Contracts

In 1994 and 1996, the U.S. Army Material Command awarded TPL two contracts involving the demilitarization and disposal of ammunitions.  The first contract, No. DAAA09-94-C-0386 ("the 1994 demilitarization contract"), was awarded on June 30, 1994, and the second, No. DAAA09-96-C-0065 ("the 1996 demilitarization contract"), was awarded on September 17, 1996.  Def.'s Mot. Summ. J., ECF No. 34, A1, A126 (hereinafter "Def.'s Mot."). The third contract at issue in this case, No. DAAA09-94-E-0014 ("the facilities use contract"),

was awarded on September 30, 1994, Def.'s Mot. A17, and permitted TPL to use portions of an Army installation located at Fort Wingate, New Mexico on a rent-free basis to conduct demilitarization operations under the demilitarization contracts. Id. at A105.

The statement of work for the 1994 demilitarization contract called for "disassembly for reuse and resource recovery of various pyrotechnic ammunition items." Id. at A6. The statement of work for the 1996 demilitarization contract contemplated "the incineration and/or reuse/resource recovery of Armor Piercing and Anti-Personnel loaded ammunition." Id. at A130, ¶ 1.1. Both demilitarization contracts provided that the "[t]he contractor shall take title to all material/components arising out of the disassembly and demilitarization of the Government Furnished Ammunition." Id. at A15, ¶ 5.1; A140, ¶ 5.1. The contracts further provided: "Title to the recovered material/components shall pass to the contractor upon Government inspection and acceptance . . . . At that point, the contractor assumes complete responsibility and liability for disposition of the recovered material/components." Id. at A16, ¶ 5.3; A140, ¶ 5.2.3.

The demilitarization contracts stated that "the contractor shall use best efforts to recover the maximum materials/components possible" and that "[t]he Government does not guarantee the quantum of recoverable materials/components." Id. at A6, ¶ 1.3; A130 ¶ 1.3. They further stated that "[t]he negotiated firm-fixed price reflects full consideration to the contractor for its performance under the contract" and that "[t]he proposed price will reflect any estimated or anticipated proceeds from recovered materials/components." Id.

Under the facilities use contract, the parties agreed that at the conclusion of TPL's use of the facilities, all government-furnished property "shall, at the contractor's sole expense and without direct charge to this contract, be returned to the Government in the same condition . . . as when originally provided less normal wear and tear." Id. at A18, ¶ 3(c). The facilities use contract initially had a term of four years, id. at A18, ¶ 2, but it was extended several times at TPL's request. Id. at A69 (extension to September 30, 2000), A86 (extension to September 30, 2002), A92 (extension to December 31, 2006 "or until transfer of the Government property to the Department of the Interior, whichever first occurs"), A180 (requesting 90-day extension beyond December 31, 2006), A102, A183 (granting extension to March 31, 2007), A186 (requesting extension to April 27, 2007), A191-93 (granting extension to April 27, 2007). TPL ultimately vacated Fort Wingate on April 27, 2007. Id. at A194-96, A197-98, A199-200.[1]

---

[1] Initially, the Army stated that it would not permit TPL to invoice for its demilitarization work until TPL had disposed of all components of the ammunitions. See id. at A108 (In an April 9, 1995 letter, TPL noted that "[t]he requirement being imposed . . . that final end-state disposal is achieved for all components before a DD250 can be approved and demilitarization credit compiled[] is not consistent with . . . our contract"). The Army eventually agreed that TPL could take title to the energetic materials and invoice for its demilitarization work before having fully disposed of the energetic material extracted from the ammunitions. See id. at A115 ("agreed to the three-part DD250 suggestion to avoid a confrontation on the definition of when Demilitarization was sufficiently complete to allow transfer of title to us.").

## II.     TPL's Failure to Dispose of Materials as Required by the Contracts

The Army permitted TPL to use a variety of facilities at Fort Wingate, including storage igloos, for its demilitarization work. On January 30, 1998, the Army requested that TPL remove any residual material from previous contracts within sixty days. Id. at A158 (January 30, 1998 letter reminding TPL of a previous agreement to remove all energetics within 60 days after title transfer via form DD250). In a letter dated February 9, 1998, TPL responded that, although it could not accomplish removal of these materials within sixty days, it "plan[ned] to sell the pyrotechnic materials over the next three years, emptying the last of the storage magazines during 2000." Id. at A159; see also id. at A162.

As the facilities use contract neared its September 30, 1998 expiration, and with the Army anticipating a transfer of the land on which Fort Wingate was situated to the Department of the Interior, the Army expressed reluctance to agree to another extension of the facilities use contract. Id. at A142; see also id. at A161. Ultimately, after inquiries from members of Congress, the Army agreed to a two-year extension of the contract. Id. at A69; see also id. at A121, A155.

In December 2001, a safety survey revealed that TPL continued to store a large quantity of energetic material at Fort Wingate despite its promise in the February 9, 1998 letter to empty the storage igloos by 2000. Id. at A172. Accordingly, in January 2002, the Army once again requested a written disposal plan. Id. In a March 1, 2002 letter, however, TPL responded that "any detailed plan is worthless." Id. at A173. TPL stated that it

> regretfully must decline your requirement for a formal plan by contract and lot number for disposal of the energetic materials at Fort Wingate . . . . [T]here was no requirement in the basic contracts for a disposal plan nor was there a time line placed on disposal of those assets. In addition[,] . . . those materials fall under the direct supervision of the Bureau of Alcohol Tobacco and Firearms (ATF) and not the Department of Defense.

Id. TPL further reported: "Slurry Explosives Corporation ("SEC") our main customer for propellant (approximately 30,000# daily) has had their Explosives Manufacturing License revoked by ATF and may be out of production for several months." Id.; see also id. at A149-54 (contract with Slurry Explosives Corporation), A178.

On November 27, 2006, approximately one month before the facilities use contract, as amended, was to expire, TPL requested a ninety-day extension of the contract. Id. at A180. TPL explained that "[t]he reason for this request is to allow TPL sufficient time to remove the stored energetic materials and complete other required departure activities." Id. The Army granted the request, extending the contract to March 31, 2007. Id. at A102, A183.

On March 21, 2007, TPL requested an extension of the facilities use contract through April 27, 2007, stating, "[w]e hope to complete shipping prior to that date." Id. at A186. The Army agreed to grant the requested extension, on certain terms, id. at A191-93, and forwarded a modification to TPL for signature. Id. at A194-96. TPL declined to sign the modification, and

3

vacated Fort Wingate on April 27, 2007, leaving behind approximately 400,000 pounds of energetic material it had recovered from the demilitarization contracts. Id. at A197-202.

### III. The Government's Disposal of the Materials

After TPL vacated Fort Wingate, the Army disposed of the energetic materials TPL left behind. Id. at A356. To dispose of this material, the Army incurred $11,887,509.72 in total costs. Id. at A357. The largest components of these costs consist of amounts the Army paid to other ammunition disposal contractors. See id. at A356. To dispose of the hundreds of thousands of pyrotechnic items left at Fort Wingate by TPL, the Army modified a pre-existing contract it had with General Dynamics Ordnance and Tactical Systems, Inc. (GDOTS), at a cost of $7,896,626. Id. at A242-46, A269, A356, A361.

In addition to the pyrotechnic items, TPL also left sixteen boxes of miscellaneous energetic material at Fort Wingate. Id. at A356. To dispose of this material, the Army issued a delivery order for a contract it had in place with PIKA International, Inc. (PIKA). Id. at A222-23. The Army incurred costs of $1,441,424.15 under the delivery order issued to PIKA. Id. at A324, A343, A356, A361.

The Army also incurred costs contracting for security at Fort Wingate, to replace the security that TPL was required to provide under its facility use contract. See id. at A35. The Government obtained the necessary security under a contract with Vista Sciences Corporation (Vista). Id. at A187-90. Vista began providing security in April 2007 under Contract No. W52P1J-07-D-3004. Id. at A189-90. The first two months of security under delivery order 0001 for this contract cost the Army $250,829.30. Id. at A189. The security contract was extended thereafter by several delivery orders at a monthly rate of $71,887.08. Id. at A204 (delivery order 0002), A212 (delivery order 0003), A289 (delivery order 0004), A299 (delivery order 0005), A325 (delivery order 0006), A329, A339 (cancellation of delivery order 0006). For security at Fort Wingate between April 2007 and the beginning of March 2008, the Army incurred costs totaling $914,046.01.2. Id. at A187, A204, A212, A216, A289, A299, A325, A329, A339.

The Army also expended resources in managing and coordinating the disposal of the energetic material TPL left at Fort Wingate. The Army incurred $1,089,534 in costs for the deployment of the Mobile Ammunition Renovation Inspection and Demil (MARID) team to assess and inventory the energetic material and then to repackage, apply proper shipping markings, and palletize the material for the shipment to disposal sites. Id. at A208-09, A210, A298, A356, A360. The Army incurred $11,860.03 in expenses for Government personnel who traveled to Fort Wingate. Id. at A357; see also A221, A293, A360-61 (providing evidence of the involvement and costs of government personnel). The Army also incurred $57,276.97 in costs for 1,587 total labor hours logged by a variety of Army personnel. Id. at A357; see also A293, A360-61. In the spreadsheet included with defendant's motion at page A360-61, the hours spent by each individual are recorded, described, and multiplied by the appropriate hourly rate for that individual's pay grade.

The Army also incurred $3,200 in costs for the removal of a compressor belonging to TPL from Fort Wingate. Id. at A307, A361. In addition, it expended $16,232.80 for hazardous

4

waste fees related to TPL's energetic material, which it paid to the State of New Mexico Environment Department Hazardous Waste Bureau. Id. at A349-50, A354, A357, A361; see id. at A315.

## IV.     This Action

On July 30, 2010, the Army issued a contracting officer's final decision under the facilities use contract. Id. at A355. In that decision, the contracting officer demanded reimbursement in the amount of $11,958,046.72 for the expenses identified above. Id. at A357. TPL filed the instant suit in this Court on July 26, 2011 seeking relief from that decision. Thereafter, the government filed a counterclaim for breach of contract, requesting damages in the amount of $11,887,509.72 plus interest. See Def.'s Mot. 6 n.2, 7 n.3. The government subsequently filed the present motion for summary judgment.

## DISCUSSION

It is undisputed and TPL acknowledges that it did not dispose of all of the energetics materials as required by the demilitarization contracts. Decl. of H. M. (Hap) Stoller ¶ 6, Pl.'s App. 3 ("Stoller Decl.") (observing that "TPL does not contest the fact that it did not dispose of all of the materials which it undertook to dispose of under the 1994 demilitarization contract"). TPL alleges, however, that it should be excused from reimbursing the government for the expenses it incurred as a result of this breach because: (1) the government committed its own breach of the contracts which contributed to TPL's failure to perform; (2) TPL's performance under the contracts was made impossible or impracticable by changed circumstances; (3) the contracts in question were based on mutual mistake of fact; and/or (4) the contracts were unconscionable.[2] Am. Compl. ¶¶ 67-93, ECF No. 8. TPL also claims that the expenses the government incurred to remove and dispose of the materials it left behind were not fair and reasonable, and that the government could have performed the services needed to complete the disposal of all remaining materials for $1,850,000, rather than the approximately $11.8 million the government seeks in its counterclaim. Am. Compl. ¶¶ 97 – 99; Pl.'s Resp. to Def.'s Mot. Summ. J. 13, ECF No. 39 ("Pl.s' Resp.").

In response, the government contends: (1) that this Court lacks jurisdiction to consider TPL's defenses because TPL did not file claims or otherwise raise the defenses before the contracting officer; and (2) that, in any event, the defenses are meritless as a matter of law. It also argues that TPL has failed to raise a genuine issue of material fact as to the reasonableness of the government's actions to mitigate the damages it suffered as a result of TPL's breach of contract. Def.'s Mot. 9-15.

For the reasons set forth below, the Court finds that the material facts are not in dispute and that the government is entitled to judgment as a matter of law for the full amount of its claimed damages. Accordingly, the government's motion for summary judgment is granted.

---

[2] TPL also alleged in its amended complaint that the provisions of the contracts were illegal. Am. Compl. ¶¶ 94-96. At oral argument, counsel indicated that TPL was no longer pressing that claim. Oral Arg. Tr. 18, September 3, 2014, ECF No. 44.

## I.  Summary Judgment Standards

The government has moved for summary judgment pursuant to Rules of the Court of Federal Claims 56.  A moving party is entitled to summary judgment when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of showing that there are no genuine issues of material fact.  Celotex Corp., 477 U.S. at 322-23.  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The movant's burden can be met by demonstrating an absence of evidence to support the nonmoving party's case.  Celotex Corp., 477 U.S. at 325.  Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence.  Anderson, 477 U.S. at 248.  Summary judgment is mandated, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

## II.  The Government Is Entitled to Summary Judgment as to TPL's Liability for Breach of Contract Because TPL Failed to Raise Its Defenses Before the Contracting Officer, and Because, in Any Event, Those Defenses Are Meritless as a Matter of Law.

The facilities use contract required TPL to return the premises to their original condition at the conclusion of their use.  Contract No. DAAA09-94-E0014, ¶ 3(c), Def.'s Mot. A18.  As noted, it is undisputed that TPL failed to meet this obligation.  See Pl.'s Resp. 2 (observing that "[p]laintiff does not take issue with the facts as stated in Defendant's Motion as far as they go").  TPL argues, nonetheless, that the government's motion for summary judgment should be denied because the assorted defenses it seeks to assert against the government's breach of contract claim create genuine issues of material fact.  Id. at 3.  TPL's argument must be rejected; the Court lacks jurisdiction to consider its defenses because TPL failed to raise them before the contracting officer.  Further, the defenses lack merit as a matter of law.

### A.  Defense based on the government's alleged breach of contract

First, TPL argues that it cannot be held liable for its breach of contract because of the government's own alleged breach of the contracts.  Am. Compl. ¶¶ 67-77; Pl.'s Resp. 7-8.  Relying upon the affidavit of its president, H. M. Stoller, TPL argues that "[d]uring the course of performance, TPL experienced multiple instances of the Government failing to perform its responsibilities."  Pl. Resp. 7 (citing Stoller Decl. ¶¶ 7-8).  Specifically, Mr. Stoller alleges that the government failed to provide "Technical Data Packages" (TDPs) on the ammunitions that were to be demilitarized.  Stoller Decl. ¶ 7.  He claims that this failure (which apparently occurred during the first year of contract performance) violated the government's obligations

6

under the 1994 demilitarization contract to "provide the contractor with technical data, to include a final assembly drawing and component assembly drawing(s) as applicable . . . for each type of ammunition delivered to the Contractor's site." Id. (citing Statement of Work for Contract No. DAAA09-94-C-0386, Def.'s Mot. A14). He states that "[t]he extent to which the failure of the Government to perform its responsibilities contributed to the circumstances which led to this Government claim is difficult to quantify. But it certainly was a contributing factor in TPL's inability to fully perform in a timely and responsive fashion." Id. at ¶ 8.

Even assuming that TPL could prove that the alleged failure to provide TDPs some twenty years ago was a breach of contract, the Court lacks jurisdiction to consider this or any other breach of contract claim asserted by TPL. Claims for breach of contract must be brought under the Contract Disputes Act, 41 U.S.C. §§ 7101–7109 (2012). Gonzales-McCauley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 716 (2010) (citing Dalton v. Sherwood Van Lines, 50 F.3d 1014, 1017 (Fed. Cir. 1995)). Under that Act, presentation of a claim for breach to a contracting officer is a prerequisite to this Court's jurisdiction to hear the claim. M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1329 (Fed. Cir. 2010); England v. Swanson Grp., Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004); Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003). See 41 U.S.C. § 7103(a) (providing that all claims by a contractor against the government shall be in writing, submitted to the contracting officer for a decision, and certified if more than $100,000).[3]

It is undisputed that TPL never raised its breach of contract claim (or any other claim) with the contracting officer. In that regard, the fact that TPL is asserting its breach of contract claim solely as a defense to the government's counterclaim is of no moment. Raytheon Co. v. United States, 747 F.3d 1341, 1354 (Fed. Cir. 2014) (citing Maropakis, 609 F.3d at 1331). The court of appeals has clearly stated that the CDA's "jurisdictional prerequisite applies even when a claim is asserted as a defense." Id. Therefore, the Court concludes that it lacks jurisdiction to consider TPL's claim for breach of contract.[4]

---

[3]The purpose of this requirement is to resolve all claims at the contracting officer level. Maropakis, 609 F.3d at 1331. Here, that objective would be frustrated if the Court heard a claim for breach of contract that was not presented to the contracting officer.

[4]In its Amended Complaint at ¶¶ 75-77, TPL asserts as part of its claim of relief for breach of contract that the government failed to use appropriated funds that were supposedly intended to assist TPL in meeting its obligations to dispose of the material. This claim is not supported by citation to any specific legislation. In fact, at the oral argument, counsel for TPL conceded that there is no specific statutory language earmarking any funds for this particular demilitarization project. Oral Arg. Tr. 18-19. In any event, TPL also does not explain how its allegations of frustration of Congressional intent, even if accurate, constitute a breach of contract by the government.

B.   **Defense based on impossibility/impracticability**

TPL also claims that it should be excused from performance of its obligations to dispose of the ammunitions by the doctrines of impossibility or impracticability of performance. Am. Compl. ¶¶ 78-83. Relying upon the assertions in the affidavit of its president, TPL claims that it had planned to dispose of the pyrotechnic materials in the ammunitions by selling them or giving them to companies in the fireworks industry. It further claims that intervening changes in U.S. tariff policies put the domestic fireworks companies with whom TPL planned to work out of business. Stoller Decl. at ¶¶ 10-11. In particular, TPL was unable to find other reuses for photoflash cartridges and was unable to timely develop an alternative and affordable process for disposing of them. Id. at ¶¶ 11-13. Similarly, TPL notes, the company with which it had an agreement to purchase demilitarized propellant for use as an explosive product in the mining industry abrogated its agreement with TPL because it concluded that the product could not be manufactured economically. Id. at ¶ 14. According to Mr. Stoller, "[t]his left TPL with over 15,000,000 pounds of demilitarized propellant in storage at Fort Wingate." Id.

"Impossibility" of performance exists "when it is objectively determined that no contractor could perform the work." Conner Bros. Const. Co., Inc. v. United States, 65 Fed. Cl. 657, 686 (2005) (citations omitted). While TPL asserts "impossibility" as a defense, the gravamen of its complaint is not that it was impossible for any contractor to dispose of the ammunitions (in fact, another contractor has now removed the ammunitions). Rather, TPL's assertion is that the costs of the disposal were prohibitive, which constitutes a claim of commercial impracticability, not impossibility. See id.

As with TPL's defense based on breach of contract, this Court lacks jurisdiction to entertain TPL's impracticability defense. In Maropakis, the court of appeals held that a contractor could not assert a defense of excusable delay against the government's claim for liquidated damages where the contractor failed to present that claim to the contracting officer. 609 F.3d at 1331. The Court noted that there was no authority for the contractor's argument for an exception to the CDA's notice requirement when a contractor's claim for contract modification is made in defense to a government claim. Id. It held that "a contractor seeking an adjustment of contract terms must meet the jurisdictional requirements and procedural prerequisites of the CDA, whether asserting the claim against the government as an affirmative claim or as a defense to a government action." Id.; see also Raytheon Co. v. United States, 747 F.3d at 1354.

TPL argues that Maropakis is inapposite because it does not seek an adjustment to the contract terms in this case but only asserts impracticability as a defense to the government's counterclaim. Pl.'s Resp. 6. But TPL fails to appreciate that impracticability is "treated as a type of constructive change to the contract; because a commercially impracticable contract imposes substantial unforeseen costs on the contractor, the contractor is entitled to an equitable adjustment." Raytheon Co. v. White, 305 F.3d 1354, 1367 (Fed. Cir. 2002); see also Ace Constructors v. United States, 499 F.3d 1357, 1364 (Fed. Cir. 2007). And, as previously discussed, Maropakis is very clear that—for purposes of determining this Court's jurisdiction under the CDA—it is irrelevant whether a claim for equitable adjustment of a contract is asserted offensively or defensively.

For the first time at the oral argument on the government's motion for summary judgment, counsel for TPL cited Sikorsky Aircraft Corp. v. United States, 102 Fed. Cl. 38, 48 n.14 (2011). TPL's counsel referred specifically to footnote 14 of the decision, which he argued provided support for TPL's position that this Court has jurisdiction over its various defenses because TPL is purportedly not seeking to adjust the terms of the contract, but rather to defend itself against the government's counterclaims. TPL's reliance upon Sikorsky is unavailing.

In Sikorsky, the contracting officer issued a final decision that the plaintiff owed damages for violations of cost accounting standards. 102 Fed. Cl. at 40, 44. In response, plaintiff filed a complaint in this court pleading affirmative defenses based on accord and satisfaction, waiver, laches, and the statute of limitations. Id. at 44. Seven months after the complaint was filed, the court of appeals decided the Maropakis case. Id. As a protective matter and "out of an abundance of caution," the plaintiff filed a new claim with the contracting officer raising its affirmative defenses. Id. After the contracting officer declined to issue a decision on the defenses, the plaintiff filed a second complaint with the court, which was consolidated with the original complaint. Id. The issue before the court was whether it had jurisdiction over either complaint in light of Maropakis.

The court concluded that even assuming that Maropakis did apply to these defenses, the court would have jurisdiction over the case because the plaintiff had raised the defenses with the contracting officer before it filed its second complaint in the case. 102 Fed. Cl. at 47-48. The court then went on in footnote 14 to discuss whether it would have had jurisdiction to consider the defenses, in any event, in connection with plaintiff's first complaint. It concluded that Maropakis was inapplicable to the plaintiff's defenses based on accord and satisfaction, waiver, laches, and the statute of limitations because the holding in Maropakis "only extends to counterclaim defenses that seek contract modification" (which the affirmative defenses at issue in Sikorsky did not) and because the affirmative defenses at issue in Sikorsky (unlike the defense of excusable delay in Maropakis) "are not claims for additional relief." 102 Fed. Cl. at 48 n.14.

As is readily apparent, the court's discussion in Sikorsky does not support TPL's argument because—as described above—other than its arguments concerning the reasonableness of the government's mitigation efforts, TPL's defenses (unlike those the plaintiff interposed in Sikorsky) do, in effect, seek contract modification. TPL's defenses are thus squarely within the rationale of Maropakis.

In any event, TPL's invocation of the impracticability defense lacks legal merit and/or sufficient evidentiary support to defeat the government's motion for summary judgment. As a general matter, a contract is commercially impracticable "when, because of unforeseen events, it can be performed only at an excessive and unreasonable cost, or when all means of performance are commercially senseless." Raytheon Co. v. White, 305 F.3d at 1367 (internal citations omitted). Commercial impracticability "excuses a party from performing unless the party has assumed the risk of the event" that rendered performance impracticable. Id. That is, "a party's performance under [a contract] is impracticable without [the party's] fault because of a fact of which [the party] has no reason to know and the non-existence of which is a basic assumption on which the contract is made." Mass. Bay Transp. Auth. v. United States, 254 F.3d 1367, 1374 (Fed. Cir. 2001) (emphasis in original) (quoting Restatement (Second) of Contracts § 266(1)).

9

As the Court of Claims observed, the "commercial impracticability standard can be easily abused; thus this court has not applied it with frequency or enthusiasm." Jennie-O-Foods v. United States, 580 F.2d 400, 409 (Ct. Cl. 1978). In particular, the doctrine "is not invoked merely because costs have become more expensive than originally contemplated." Id. Further, a party may not rely upon the doctrine of impracticability where increased costs are based on changes in market conditions that are part of the risk the party assumed in entering the contract. Agility Def. & Gov't Servs., Inc. v. United States, 115 Fed. Cl. 247, 252 (2014) (citing Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002)).

Here, TPL's claims of unanticipated costs arising out of changes in tariff policy and environmental regulations are insufficient to establish impracticability of performance. The nonoccurrence of such changes was not a basic assumption of the contract. To the contrary, the contract is clear that once title to the materials passed to TPL, TPL "assume[d] complete responsibility and liability" for their disposition. Def.'s Mot. A16, ¶ 5.3; A140, ¶ 5.2.3. Further, in the contract the government expressly disclaimed any "guarantee" regarding "the quantum of recoverable material/components." Id. at A6, ¶ 1.3; A130, ¶ 1.3. Because TPL assumed the risk that changes in market conditions might occur and make its performance more expensive, it cannot rely upon "impracticability" as a defense to its liability for breach of the contracts. See Conner Bros. Const. Co., Inc. v. Geren, 550 F.3d 1368, 1379 (Fed. Cir. 2008).[5]

### C.    Defense based on mutual mistake of fact

Citing the same factual assertions as those upon which it relies for its impossibility/impracticability argument, TPL urges that its performance should be excused under the doctrine of mutual mistake of fact. Am. Compl. ¶¶ 84-90. According to TPL, both it and the government mistakenly believed "that the energetic materials could be disposed of in a manner that was both commercially feasible and legally possible." Pl.'s Resp. 10 (citing Stoller Decl. ¶¶ 17-20).

In order to establish mutual mistake of fact, a plaintiff must demonstrate that: "(1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation." Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990). Reformation, rescission, and restitution are all available remedies in the case of a mutual mistake. Rosenburg Lumber Co. v. Madigan, 978 F.2d 660, 665 (Fed. Cir. 1992).

---

[5] Also, TPL has not specified the extent to which its costs would have been increased had it met its obligations to dispose of the pyrotechnic material. In order to demonstrate impracticability based on the existence of excessive costs that would make performance "commercially senseless," TPL would be required to produce evidence that any cost overrun was "so significantly disparate so as to warrant a finding of impracticability." Conner Bros., 65 Fed. Cl. 657, 687 (2005) (citing cases in which cost overruns of up to 70% were not sufficient to demonstrate impracticability).

Like TPL's impossibility/impracticability defense, the defense of mutual mistake of fact seeks a reformation of the terms of the contract. But TPL did not submit a claim to the contracting officer seeking reformation of the contract on the basis of mistake. Accordingly, this Court lacks jurisdiction to consider this defense. See Maropakis, 609 F.3d at 1331; Raytheon Co. v. United States, 747 F.3d at 1354.

Further, and in any event, the defense lacks merit as a matter of law. Among other things, as described above, the contract clearly placed the risk of paying for the disposal of the materials on TPL. It also expressly disclaimed any guarantees regarding the amount of materials that TPL might recover and convert for sale or other purposes. Because the contract "put the risk of the mistake on the party seeking reformation," TPL cannot assert a defense based on mutual mistake of fact. Atlas Corp., 895 F.2d at 750.

### D. Defense based on unconscionability

Finally, TPL also asks to be excused from its contractual obligation on the grounds that the 1994 demilitarization contract was unconscionable. Am. Compl. ¶¶ 91-93; Pl.'s Resp. 10-11. Specifically, Mr. Stoller states in his declaration that "[i]n hindsight, the 1994 Pyro Demil contract was an unconscionable contract" because, among other similar reasons, the government "knew or should have known" that the process of "resource recovery and reuse" of energetic materials was not a commercially viable one. Stoller Decl. ¶¶ 21-25.

An unconscionable contract provision is one "which no man in his senses, not under a delusion, would make, on the one hand, and which no fair and honest man would accept on the other." Fraass Surgical Mfg. Co. v. United States, 571 F.2d 34, 40 (Ct. Cl. 1978) (quoting Hume v. United States, 21 Ct. Cl. 328, 330 (1886), aff'd, 132 U.S. 406 (1889)); see also Peters v. United States, 694 F.2d 687, 694 (Fed. Cir. 1982). In cases where a court finds a contractual provision unconscionable, it has the power "to refuse to enforce the agreement in its entirety, to delete the unconscionable clause and enforce the remainder of the contract, or to limit the unconscionable clause's application so that an unconscionable result will be avoided." 8 Williston on Contracts § 18:17 (4th ed.). As the Court of Claims explained in Fraass, 571 F.2d at 40, "[t]he grant of discretion to deny enforcement to an unconscionable clause . . . is not intended to permit courts to redistribute risks allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise."

TPL's unconscionability argument is meritless on its face, as it is expressly based on "hindsight." Unconscionability is determined at the time the parties entered into the contract. Glopak Corp. v United States, 851 F.2d 334, 338 (Fed. Cir. 1988). Therefore, "[t]he fact that the actual application of [a contractual provision] had an adverse effect on [one of the contracting parties] would not justify retroactively invalidating it as unconscionable." Id.

In any case, as with its impossibility/impracticability and mutual mistake of fact defenses, TPL's defense based on unconscionability seeks to modify its obligations under the contracts with the government. TPL did not, however, raise this claim with the contracting officer. Accordingly, under Maropakis, this Court lacks the jurisdiction to consider this defense.

11

### III. The Government Is Entitled to an Award of Damages for the Full Amount of Its Claimed Costs.

As noted above, the government seeks an award of $11,887,509.72 in damages as reimbursement for the costs it incurred to dispose of the demilitarized ammunitions at Fort Wingate. TPL challenges the amount of damages claimed by the government, contending that it is excessive. It urges that there are genuine issues of material fact regarding the reasonableness of the government's expenditures, precluding a grant of summary judgment in the government's favor.

A non-breaching party has a duty to mitigate its damages. Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1375 (Fed. Cir. 2005); Robinson v. United States, 305 F.3d 1330, 1336 (Fed. Cir. 2002); Restatement (Second) of Contracts § 350, cmt. b (1981) ("As a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts."). The obligation to mitigate damages arises "once a party has reason to know that performance by the other party will not be forthcoming." Ind. Mich. Power Co., 422 F.3d at 1375 (quoting Restatement (Second) of Contracts § 350, cmt. b).

When mitigating damages from a breach, the non-breaching party must "make only 'those efforts that are fair and reasonable under the circumstances.'" First Heights Bank, FSB v. United States, 422 F.3d 1311, 1316 (2005) (quoting Home Sav. of Am.v. United States, 399 F.3d 1341, 1353 (Fed. Cir. 2005)). It "is not required to make extraordinary efforts to ferret out the single best situation which will absolutely minimize the breaching party's damages. All that is required is that the [non-breaching party] act reasonably and promptly given the circumstances." Ketchikan Pulp Co. v. United States, 20 Cl. Ct. 164, 166 (1990). The breaching party bears the burden of proof to show that the non-breaching party failed to take reasonable steps to mitigate its damages. T. C. Bateson Const. Co. v. United States, 319 F.2d 135, 160 (Ct. Cl. 1963).

As noted above, summary judgment is mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Because TPL bears the burden of proof, in order to avoid summary judgment, it must produce evidence sufficient to allow a reasonable fact finder to conclude that the government's mitigation efforts were not fair and reasonable under the circumstances. For the reasons set forth below, the Court concludes that TPL has failed to produce such evidence. Accordingly, the government is entitled to summary judgment for the entire amount that it seeks in its counterclaim.

#### A. Expenditures for security

TPL challenges as unreasonable the $958,933.09 that the government spent for security. Its challenge is based entirely on assertions contained in the declaration of its president, H. M. Stoller, that "TPL had previously performed these services in its tenure at Fort Wingate through three different contractors in Gallup, NM at a cost of approximately $8,000 per month" and that

"[i]t was possible with simple competition to obtain these services for a total of approximately $100,000." Stoller Decl. ¶ 27a.

These bare assertions by Mr. Stoller are unsupported by any specific details or documentation. Among other things, Mr. Stoller fails to identify the contractors through whom TPL performed security services or explain the precise services that they provided or supply the contracts under which those services were provided. Without such documentation or at least a detailed explanation, TPL is left with only an unsupported assertion that "[i]t was possible with simple competition" for the Army to have secured for only $100,000 the same services for which it spent $958,933.09.

As the court of appeals has observed, "[m]ere conclusory statements and denials do not take on dignity by placing them in affidavit form." Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1564 (Fed. Cir. 1987); see also Lathan Co. v. United States, 20 Cl. Ct. 122, 125 (1990) (citing Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984) ("[B]ald assertions and speculation do not create an evidentiary conflict sufficient to defeat a summary judgment motion.")). Mr. Stoller's bare assertions would not be sufficient for a reasonable finder of fact to conclude that the Army's expenditures for security services were excessive or unreasonable. Because it is TPL's burden to demonstrate the unreasonableness of the Army's mitigation efforts, the government is entitled to summary judgment as to the $958,933.09 it spent for security.

      **B.     Expenditures for disposal of materials left by TPL**

TPL also challenges as excessive and unreasonable the $7,896,626 that the Army spent to modify a pre-existing contract it had with GDOTS to secure other contractors to dispose of the hundreds of thousands of pyrotechnic items left at Fort Wingate. Mr. Stoller asserts that TPL had obtained a bid from another contractor (Clean Harbors Environmental) to perform the majority of this same work for the price of $1,600,000. Stoller Decl. ¶ 27b.[6] According to Mr. Stoller, TPL "informed the Army of the Clean Harbors bid," but "Army officials stated that they were not concerned with the cost" and so performed the work through a sole source bid. Id. He claims that "[f]lares and candles were shipped to the TPL-developed Magnesium Recovery Facility at the Crane Army Ammunition Activity, an option denied to TPL." Id.

Mr. Stoller's affidavit is again inadequate to defeat the government's motion for summary judgment. Among other things, it fails to allege specific facts or to provide any documentation to support a conclusion that the Clean Harbors bid of $1,600,000 (a copy of which was not submitted along with Mr. Stoller's declaration) was for the same work that the Army ultimately enlisted GDOTS to perform.[7] In fact, the government has produced copies of

---

[6] Mr. Stoller asserts that this contract would have included all but sixteen boxes of too-hazardous-to-move materials. Stoller Decl. ¶ 27b.

[7] The government has submitted what appears to be a spreadsheet that was used by Clean Harbors to come up with its quote. That document appears to indicate that the Clean Harbors quotation upon which TPL relies here was based on inaccurate assumptions about the weights of

13

the quotation TPL secured from another contractor (EBV Explosives Environmental Company) that ultimately performed the work for the Army as a subcontractor. Def.'s Reply S.A. 1, 4. EBV's quotation ($7,123,517.21) was significantly higher (by a magnitude of almost 450%) than Clean Harbors' quotation and much closer to the costs the Army actually incurred. Id. at 4. Thus, the Court concludes that TPL has failed to raise a genuine issue with respect to the reasonableness of the Army's expenditure of $7,896,626 to dispose of the pyrotechnic materials.

## C. Expenditures to destroy sixteen boxes of hazardous material

TPL's objection to the $1,441,424.15 expense the Army claims it incurred to destroy sixteen boxes of material that were unstable and too hazardous to move is similarly inadequate to defeat the government's motion for summary judgment. Mr. Stoller states that TPL "initially proposed to perform this task at its own cost and would have used its own on-site explosion ordinance disposal personnel," but that "[t]he Government[8] denied permission to TPL to perform this action." Stoller Decl. ¶ 27c. Mr. Stoller's statement contains no basis for concluding that the method that the Army chose to dispose of this material—through a delivery order for a contract it had in place with PIKA International, Inc.—was excessive or otherwise unreasonable. Thus, the Court concludes that TPL has failed to raise a material factual dispute with respect to the reasonableness of the Army's expenditure of $1,441,424.15 to destroy the sixteen boxes of material that were unstable and too hazardous to move.

## D. Expenditures to inventory and prepare energetic material for shipment to disposal sites

TPL challenges $1,089,534 in costs that the Army incurred for the deployment of the MARID team to assess and inventory the energetic material and then to repackage, apply proper shipping markings, and palletize the material for the shipment to disposal sites. Mr. Stoller asserts that these costs were incurred unnecessarily because TPL had already accurately inventoried, packaged, and prepared the material for shipment, including "palletizing" and "banding" the material. Stoller Decl. ¶ 27.

On its face, Mr. Stoller's assertion is insufficient to raise a genuine issue regarding the reasonableness of this expenditure by the Army. Whether or not TPL's prior inventory had been an accurate one, with a new plan in place for transport of energetic material to disposal sites, it was self-evidently not unreasonable for the Army to do a new inventory, repackage the material, apply new shipping labels and markings, and repalletize the material for shipment. Indeed, doing otherwise would have arguably been reckless. Thus, the Court concludes that TPL has

---

the materials that would be subject to disposal. See Def.'s Reply, Supplemental Appendix (S.A.) at 7 (quote based on assumption that each unit to be disposed of weighs one pound).

[8] At the oral argument on the government's motion for summary judgment, counsel for TPL clarified that the statement that "the Government denied permission to TPL" to dispose of the sixteen boxes on site referred to the New Mexico Environmental Department's refusal to approve TPL's proposal to destroy the materials in place. Oral Arg. Tr. 6.

failed to raise a material factual dispute with respect to the reasonableness of the Army's expenditure of $1,089,534 for these purposes.

### E.     Miscellaneous Expenditures

Finally, TPL concedes that it lacks any evidence to establish the unreasonableness of the following government expenditures: (1) $11,860.03 for government travel costs; (2) $16,232.80 for hazardous waste fees; and (3) $57,276.97 in labor costs. Stoller Decl. ¶¶ 27(e)-(h). Accordingly, the government is entitled to summary judgment as to these elements of damages as well.

## CONCLUSION

On the basis of the foregoing, the government's motion for summary judgment is **GRANTED**. The Clerk of the Court is directed to enter final judgment for the defendant in the amount of $11,887,509.72, plus interest, calculated pursuant to section 7109 of the Contract Disputes Act.

**IT IS SO ORDERED.**

s/Elaine D. Kaplan
ELAINE D. KAPLAN
Judge, U.S. Court of Federal Claims
